IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Teresa Ann Rutland,<br><br>Plaintiff,<br><br>vs.<br><br>Commissioner of Social Security,<br><br>Defendant. | CASE NO. 1:22-cv-2054<br><br>DISTRICT JUDGE<br>Patricia A. Gaughan<br><br>MAGISTRATE JUDGE<br>James E. Grimes Jr.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Teresa Ann Rutland filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In April 2020, Rutland filed an application for supplemental security income alleging a disability onset date of March 4, 2020.[1] Tr. 187, 188. The Commissioner denied Rutland's application at the initial level and upon

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

reconsideration. Tr. 81–91, 92–102. In September 2021, an ALJ held a hearing at which Rutland and a vocational expert testified. Tr. 33–56. In early October 2021, the ALJ issued a written decision finding that Rutland was not disabled. Tr. 13–32. The ALJ's decision became final in September 2022, when the Appeals Council declined further review. Tr. 1–7; *see* 20 C.F.R. § 404.981. Rutland filed this action in November 2022. Doc. 1. She asserts the following assignment of error:

> The ALJ's assessment of psychiatric nurse practitioner Donna Colucci, APRN, CNP's *Off-Task/Absenteeism Questionnaire* is not presented by substantial evidence.

Doc. 7, at 7.

## Factual background

### 1. *Personal and vocational evidence*

Rutland was born in July 1976 and was 43 years old on her alleged disability onset date. Tr. 25, 187. She graduated from high school and completed one year of college. Tr. 214. She has no past relevant work. Tr. 24.

2

## 2. *Medical evidence*[2]

In February 2019, Rutland underwent a computed tomography scan of her brain. Tr. 448. The results were normal and showed no evidence of an acute cortical infarct or intracranial hemorrhage. *Id*.

For many years before the relevant time period, Rutland went to Signature Health on a monthly basis for medication management and counseling.[3] Tr. 633–1097, 1186–1202, 1376–1444, 1488–99. In June 2019, a year before Rutland's alleged disability onset date, Rutland switched medication-management providers and began seeing Donna Colucci, APRN, CNP, at Signature Health.[4] Tr. 899–903. Colucci found that Rutland had fair grooming, attitude, memory, and eye contact. Tr. 901.02. Rutland's attention

---

[2]     Rutland includes no facts in the facts section of her brief and instead says that the relevant "evidence is described in [a] supplement filed herewith." Doc. 7, at 4. But the Court's initial order specifically instructed Rutland that "[i]ncluding evidence in the supplement *does not* relieve Plaintiff of the obligation … to specifically cite all relevant facts in the Facts section of Plaintiff's briefs." Doc 4, at 2 (emphasis added). It instructed that (1) "[a]ny facts recited in support of the Argument or Analysis section of a brief must also be set forth in the Facts section of the brief," and (2) "[t]he Court will deem waived a party's reliance on any evidence not included in the party's brief(s)." Doc. 4, at 2–4 (emphasis added). Given Rutland's omission, this recitation of medical evidence is limited to to the facts provided in the Defendants' brief and those other necessary for context.

[3]     Rutland testified that she had been receiving mental health treatment at Signature Health "[p]robably since 2007, give or take." Tr. 50–51. Her treatment records indicate an intake date in May 2002. Tr. 899.

[4]     APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id*.

and concentration were normal. Tr. 902. Her mood was depressed and anxious and her affect was congruent. *Id*. Rutland had coherent speech with intact associations and occasional suicidal ideations but no plans to act on her thoughts. *Id*. Her judgment and insight were poor. *Id*. Colucci maintained Rutland's diagnoses—unspecified anxiety disorder and depressive disorder not otherwise specified—and continued prescriptions for Prozac and Zonisamide without adjustment. Tr. 903.

Over the next six months, Colucci found Rutland's attention, focus, and concentration decreased, her mood depressed and anxious, her affect congruent, and her judgment fair or poor, and her insight poor. Tr. 913–14, 919–20, 925–26, 931–32. Once, Rutland reported that her thoughts raced at night. Tr. 914. Other times, Colucci recorded Rutland's thoughts as generally racing. *See* Tr. 920, 925.

During their February 2020 appointment, Colucci found that Rutland's grooming, attitude, and eye contact were fair. Tr. 937. Her attention and concentration were normal. Tr. 938. She had a depressed and anxious mood with a congruent affect and her thoughts were racing. *Id*. Rutland had intact associations and fair memory, judgment, and insight. *Id*.

In March, April, June, and July 2020, Colucci observed that Rutland had decreased focus and concentration, a depressed and anxious mood, racing thoughts, poor judgment, poor memory, and poor insight. Tr. 944, 950, 956, 962, 1104.

4

In December 2020, Colucci found that Rutland was alert and oriented with a depressed and anxious mood, racing thoughts, loose associations "at times[,]" a fair memory, no abnormal or psychotic thoughts, and decreased concentration and attention "at times." Tr. 1392.

Rutland saw Preetha Muthusamy, M.D., at Ashtabula County Medical Center in January 2021. Tr. 1291. She reported that her headaches were "much better." Tr. 1324.

In February 2021, Rutland had an appointment with Colucci. Tr. 1383–88. Colucci found that Rutland had decreased attention and concentration, depressed and anxious mood, racing thoughts, poor judgment, and poor insight. Tr. 1386.

During Rutland's March 2021 appointment with Colucci, she had normal attention and concentration, a depressed and anxious mood with a congruent affect, racing thoughts, intact associations, a fair memory, poor judgment, and poor insight. Tr. 1379.

In April and May, Colucci noted Rutland's decreased attention and concentration, depressed and anxious mood with congruent affect, racing thoughts, poor judgment, and poor insight. Tr. 1408, 1415.

In July 2021, Rutland had a follow-up with Dr. Muthusamy at Ashtabula County Medical Center. Tr. 1448. She continued to report "much better" headaches. Tr. 1448.

In August 2021, Rutland had an appointment with Colucci during which she reported doing well on her medications without any side effects. Tr. 1490. Rutland said her mood was stable and her sleep and appetite were good. *Id*. Rutland reported that her stressors were finances and parenting. *Id*. She said that one to six months ago, she began having feelings of sadness and guilt accompanied by nervousness or anxiousness, restlessness, and increased fatigue. *Id*. Colucci noted that Rutland's medication was effective. *Id*. Colucci found that Rutland appeared "[g]enerally good," *id*., and had unremarkable speech, a full affect, a neutral or euthymic mood[5] an appropriate demeanor, alert attention, a grossly intact memory, fair insight and judgment, and a circumstantial thought process. Tr. 1491.

A few days later, Rutland saw licensed clinical counselor Telisa Cross for individual counseling at Signature Health. Tr. 1494. Rutland reported feeling happy and positive and reported that things were going well for her. Tr. 1494. She was having regular visits with her son and they were growing closer. *Id*. Rutland was cleaning for a few people to make extra money. *Id*. Cross observed that Rutland was actively engaged in the counseling session. *Id*. Cross found Rutland's behavior cooperative and generally relaxed and engaged. *Id*. Cross described Rutland's mood as neutral and happy as well as

---

[5] Euthymia is the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline, https://www.healthline.com/health/euthymic [https://perma.cc/N58P-H5B3]. A euthymic person has a calm and steady mood, and typically experiences feelings of cheerfulness and tranquility with an increased resilience to stress. *Id*.

anxious and pleasant. *Id*. She noted that Rutland had an appropriate and bright affect, unremarkable thought content and perception, and appropriate insight and appropriate judgment. *Id*. Her speech and thought processes were coherent and logical. *Id*. Rutland was attentive and engaged for the duration of the session. *Id*.

### 3. Function report

In June 2020, Rutland completed a Function Report. Tr. 242–50. In it, Rutland reported that she needed a reminder to take her medications. Tr. 244. She said that she needed help balancing her checkbook due to her epilepsy. Tr. 245. She checked boxes indicating that her illnesses, injuries, or conditions had affected her memory, her completion of tasks, and her concentration. Tr. 247. Rutland checked a box indicating that she had problems getting along with family, friends, neighbors, and others but declined to explain her answer. *Id*. Rutland said that she got along "fair" with authority figures. Tr. 248. She checked a box indicating that she had noticed unusual behaviors or fears and explained that she "behaved poorly" when she was mad. *Id*.

*4.  State agency and other medical opinion evidence*[6]

In August 2021, nurse practitioner Colucci filled out three check-box forms. See Tr. 1482–84. In one of the forms, entitled "Off-Task/Absenteeism Questionnaire," Colucci checked boxes identifying Rutland as having a mild limitation in the ability to adapt or manage herself, a moderate limitation in interacting with others, and marked limitations in understanding, remembering, and applying information as well as concentrating, persisting, and maintaining pace. Tr. 1483. Colucci  checked a box expressing her estimation that Rutland would likely be "off-task at least 20% of the time" during the workday. Tr. 1482. Colucci then checked boxes indicating that her reasons for her findings were Rutland's "[u]nderlying mental impairments established by objective and clinical findings" and Rutland's "[i]nability to concentrate, pay attention, and/or focus on a sustained basis." *Id*. Colucci also checked a box expressing her estimation that Rutland would likely miss about two days of work per month. Tr. 1482.

---

[6]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

On a "Medical Statement Concerning Depression, Bipolar, and Related Disorders" form, Colucci indicated by circling that Rutland had the following symptoms: depressed mood, feelings of guilt or worthlessness, and difficulty concentrating or thinking. Tr. 1483. Colucci checked boxes indicating that Rutland had marked limitations in her abilities to understand, remember, and apply information as well as concentrate, persist, and maintain pace. *Id*. Colucci checked a box indicating that Rutland had a moderate limitation in her ability to interact with others. *Id*. She checked a box indicating that Rutland had a mild limitation in her ability to adapt or manage herself. *Id*.

On a "Medical Statement Concerning Anxiety and Obsessive-Compulsive Disorders" form, Colucci circled the following symptoms to indicate that they were symptoms of Rutland's anxiety: restlessness, difficulty concentrating, and sleep disturbance. Tr. 1484. Colucci checked boxes indicating that Rutland had marked limitations in her abilities to understand, remember, and apply information as well as concentrate, persist, and maintain pace. Tr. 1484. Colucci checked a box indicating that Rutland had a moderate limitation in her ability to interact with others. *Id*. She checked a box indicating that Rutland had a mild limitation in her ability to adapt or manage herself. *Id*.

In November 2020, consultative psychologist J. Joseph Konieczny, Ph.D., conducted a psychological evaluation at the request of the Social Security Administration. Tr. 1212–17. His examination consisted of a clinical

interview, an intelligence test, and a memory test. Tr. 1212. Dr. Konieczny also reviewed Rutland's Signature Health records, school records, and Function Report. *Id*. During the clinical interview, Rutland reported a history of depression but denied ever being hospitalized for psychiatric reasons. Tr. 1213. She reported that she had a congenital seizure disorder and that her last seizure was in 2013. *Id*. Since then, she had controlled her seizures with medication. *Id*.

Rutland reported participating in daily household activities—cooking, cleaning, laundry, and other tasks—and completed her own activities of daily living. Tr. 1214. She said that she attended to her daily hygiene, got dressed, watched television, ran errands, attended appointments, prepared meals, spent time online, visited her mother in the afternoon, read, and interacted with her fiancé in the evening. Tr. 1214. Rutland said that she regularly attended church and occasionally attended outside social activities with friends. *Id*. She said that she did her own shopping and managed her own finances. *Id*. She had a checking account but no credit cards in her name. *Id*.

Dr. Konieczny found that Rutland was "very pleasant and cooperative and responded readily to all questions and tasks posed to her." *Id*. Her grooming and hygiene were adequate. *Id*. She showed no indication of nervousness or anxiety. *Id*. Dr. Konieczny observed no indication of any paranoia, grandiose thinking, or delusions. *Id*. Rutland denied having ever experienced auditory or visual hallucinations. *Id*. Dr. Konieczny found that

10

Rutland showed no signs of undue impulsivity though she reported occasional difficulty controlling her temper. *Id*. Rutland described having an overall adequate level of motivation. *Id*. Rutland expressed herself in a clear and coherent manner with appropriate eye contact throughout the evaluation. Tr. 1214. Her ability to concentrate and attend to tasks showed no indications of impairment. *Id*. Rutland was able to perform a subtraction test without error and recalled two of three objects after a period of minutes. *Id*. She showed no deficits in her ability to perform logical abstract reasoning. *Id*.

Dr. Konieczny found that Rutland had fair insight and judgment, observed no deficits in her awareness of the rules of social judgment and conformity, and noted that she appeared capable of managing her own daily activities and handling her financial affairs without assistance. *Id*. He noted that Rutland's overall level of functioning was at a "slightly reduced level of efficiency," which was "reflective of her depression and neurocognitive deficits." *Id*. The results of Dr. Konieczny's intelligence test showed a full scale IQ of 71 which "place[d] [Rutland] in the borderline range of adult intellectual functioning." Tr. 1215. The results of Dr. Konieczny's memory test showed "a significant degree of scatter and range from well within the extremely low level up to the low average level." *Id*. Dr. Konieczny found that Rutland's history of seizure episodes had "impacted her memory functioning." *Id*. Dr. Konieczny found that Rutland had no limitations in attention, concentration, and persistence in single and multi-step tasks. Tr. 1216. He found that she had a

11

diminished tolerance for frustration and diminished coping skills. *Id*. He opined that these diminished abilities would affect Rutland's ability to respond to typical vocational supervision and interpersonal situations. *Id*. Dr. Konieczny found that Rutland had a diminished tolerance for frustration and diminished coping skills, which he opined would affect her ability to respond to typical pressure situations in a work setting. *Id*.

Based on the evaluation, Dr. Konieczny diagnosed Rutland with major neurocognitive disorder due to history of seizures, without behavioral impairment, as well as depressive disorder marked by "depressive episodes with insufficient symptoms." Tr. 1216. He found that although Rutland had not suffered a seizure since 2013, she nonetheless "continue[d] to experience intellectual and cognitive impairment as a result of" her history of seizures. *Id*. Dr. Konieczny found that Rutland had neither a limitation in the area of understanding, remembering, and carrying out instructions nor in her attention and concentration. *Id*. Dr. Konieczny observed deficits in Rutland's capacity to respond appropriately to supervisors, coworkers, and pressure in the work setting due to her diminished tolerance for frustration and diminished coping skills, which he noted were secondary to her neurocognitive disorder and depression. Tr. 1216.

In November 2020, state agency psychologist Irma Johnston, Psy.D., reviewed the medical evidence and found that Rutland had severe mental impairments including neurocognitive deficits due to her history of seizures,

and that she was functioning at the below average range of intelligence. Tr. 89.

Dr. Johnston found that Rutland had no more than moderate limitations in

her ability to (1) understand, remember, and apply information; (2) interact

with others; (3) concentrate, persist, and maintain pace; and (4) adapt and

manage herself. Tr. 85–86. Dr. Johnston opined that Rutland retained the

mental residual functional capacity (RFC)[7] to carryout simple, one- to two-step

tasks in a static work environment free from any fast pace and where change

was infrequent. Tr. 89–90. Dr. Johnston found that Rutland could interact with

others superficially but not with the general public. Tr. 89. In April 2021, upon

reconsideration, state agency psychologist Karla Delcour, Ph.D., reviewed the

medical evidence and adopted Dr. Johnston's findings. Tr. 95–96, 98–100.

### 5. *Testimonial evidence*

Rutland and a vocational expert testified during the hearing in

September 2021. Tr. 33–56. Rutland was represented by attorney Chad Delesk.

Tr. 33. Delesk began the substantive portion of the hearing with an opening

statement advocating on Rutland's behalf. Tr. 39–40. Rutland then testified.

Tr. 40–52.  Rutland lived with a fiancé and has two children—ages 13 and 15—

from a previous relationship. Tr. 42, 43. Her children lived in foster care and

Rutland saw them once a week. Tr. 42. She was working to regain custody of

---

[7]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

her younger child. *Id*. Rutland did not have a driver's license and used her bicycle to get around. *Id*. She recently rode her bicycle to a local beach with one of her children. Tr. 42–43.

Rutland said that she did the household chores—swept, dusted, did the dishes, cooked the meals—and sometimes did not see her fiancé all day. *See* Tr. 43. She had no problems lifting or carrying things up to "maybe 25 pounds." Tr. 43–44. Sometimes she carried more than 25 pounds but would struggle if she had to handle anything over "like 55 pounds" by herself. Tr. 44. If Rutland did "too much" with her hands—coloring, writing, or going on the computer—her hands started hurting and she would what she was doing. Tr. 44. Her back started to hurt if she stood too long but she had no problems sitting. Tr. 44–45.

Rutland testified about her migraine headaches. Tr. 47. She said that about once a month, she developed a migraine that lasted for about three or four hours. Tr. 47. To relieve her pain, Rutland took medication. *Id*. Rutland estimated that about 25% of her migraines were severe enough that she needed to lie down on her mattress without a pillow. Tr. 47–48.

The ALJ asked how Rutland's condition affected her ability to work and Rutland answered that her inability to get along with others when she was anxious prevented her from working. Tr. 43. Rutland explained that she got "nerved up over … customers and stuff like that." *Id*. Rutland specified that this did not affect her interactions with customers or fellow workers. Tr. 49–50. The problem was, Rutland explained, that she felt that she frustrated her

managers. *See* Tr. 48–49. Her difficulty learning meant that she would "need the manager and the manager would get mad." Tr. 50. For example, as an employee at a McDonald's restaurant, Rutland had trouble operating the register.[8] Tr. 48–49. She would make mistakes as a cashier—for example, shutting the cash drawer too soon—and need to call the on-duty manager over to help. Tr. 50. This happened "quite often" at McDonald's. *Id*. Rutland felt as if she similarly annoyed her manager when she worked at a Dollar General store,[9] though it was "just occasional" at Dollar General because Rutland "picked up on it after a while." *Id*.

Rutland graduated from high school and attended some college. Tr. 48. She was enrolled in both regular and special education classes. *Id*. Rutland had been attending counseling for depression and anxiety for many years. Tr. 50–51. The ALJ asked if Rutland had trouble concentrating. Tr. 51. Rutland answered affirmatively and explained that she could only read or study her Bible for five minutes before inevitably becoming irritated at something she'd done—writing the wrong word or misspelling something—at which point the mistake would "drive her crazy" and she "[couldn't] do [any] more." Tr. 52. Rutland knew that when that happened, she needed to walk away and take a five minute break. Tr. 52.

---

[8]     Rutland reported having worked as a crewmember at McDonald's for two months in the summer of 2018. Tr. 223.

[9]     Rutland reported having worked as a cashier at Dollar General for two months in 2019. Tr. 223.

After Rutland, vocational expert Brett Salkin testified. Tr. 52–55. According to Salkin, a hypothetical individual with the same age, education, and work experience as Rutland and with the limitations assessed in Rutland's RFC, described below, could perform unskilled labor at a maximum of a medium level of exertion. Tr. 54. Salkin testified about medium work that was available to such an individual including dishwasher, cleaner, and laundry worker. Tr. 53. If the hypothetical individual could only perform light work and occasionally climb ramps or stairs, Salkin confirmed that there would still be jobs available to him or her. Tr. 54. A limitation to only frequently handling or fingering objects bilaterally would not preclude work. *Id.* If the individual could not have contact with the general public, he or she would still be able to perform light and medium work, although not in food service. Tr. 54. Being off task for more than 10 percent of the work day or absent more than once a month would preclude such an individual from all work. Tr. 55.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1.  The claimant has not engaged in substantial gainful activity since March 4, 202, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: seizure disorder, asthma, migraines, hypertension, depression, and neurocognitive disorder (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c), except [n]ever climb ladders, ropes, or scaffolds. No concentrated exposure to extreme heat and cold. No concentrated exposure to wetness[] and humidity. No concentrated exposure to pulmonary irritants such as fumes, dust, gases, odors and poor ventilation. Avoid the use of moving machinery, commercial driving, and unprotected heights. Can perform simple, routine and repetitive tasks. The work environment must be free of fast-paced production requirements and involve only routine work place changes, with only occasional public contact, occasional interaction with co-workers, and superficial contact with others, defined as no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety or welfare of others.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born [in July] 1976 and was 43 years old, which is defined as a younger individual age 18–49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 4,

2020, the date the application was filed (20 CFR 416.920(g)).

Tr. 19–25.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.

1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

*Whether substantial evidence supports the ALJ's assessment of the medical opinions provided by nurse practitioner Colucci.*

As noted, *see* note 2, *supra*, Rutland violated the Court's Initial Order in this case when she failed to include any facts in the *Facts* section of her brief, *see* Doc. 7, at 4. In the *Argument* section of her brief, she relies on evidence that she didn't include in the *Facts* section of her brief, in violation of the Court's Initial Order. *See* Doc. 4, at 3 ("All facts relevant to the legal issues and discussion must be set forth in the *Facts* section."), 4 ("Any facts recited in support of the *Argument* or *Analysis* section of a brief must also be set forth in the *Facts* section of the brief."). Because Rutland has failed to comply with the Court's Initial Order to set forth in the *Facts* section of her brief the evidence that serves as the basis for her argument, she has forfeited her argument. Her sole argument should be rejected on this basis alone.

Even if the Court considers Rutland's argument, however, it fails. In his decision, the ALJ found unpersuasive Colluci's opinions. Tr. 24. The ALJ's rationale for finding Colucci's opinions unpersuasive was that (1) Colucci's opinions were delivered through checked boxes without sufficient explanation and (2) Colluci's limitations were not supported by the objective medical evidence, including mental status examinations. *Id*. After finding that Colucci's opinions did not meet the standards of supportability and consistency, the ALJ declined to adopt them.

Rutland claims that the ALJ did not sufficiently explain his consideration of the supportability factor because the decision "mischaracterized the underlying evidence of record." Doc. 7, at 9. She claims that the ALJ's conclusion regarding the consistency factor—that Colucci's opinion was not consistent with other evidence in the record, including mental status exams—was incorrect. *Id*. Rutland argues that the ALJ should have found Colucci's opinions persuasive because, factually, Colucci's opinions were supported by and consistent with other evidence in the record. *Id*. Rutland notes that if the ALJ had (1) adopted Colucci's opinions regarding Rutland's likely absenteeism and daily off-task percentage and (2) credited the testimony of vocational expert Salkin, Rutland would have been deemed precluded from all work. *See* Tr. 55, 1482; Doc. 7, at 10. Hence, Rutland claims that the ALJ's discount of Colucci's opinion prejudiced Rutland. Doc. 7, at 10

Under the applicable standard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, Colucci's opinion lacked any explanation for her opinion that Rutland would be absent from work twice per month. Tr. 24 (citing Tr. 1482). Colucci checked boxes purporting to explain her finding that Rutland would be off-task at least 20% of the time—due to Rutland's "[u]nderlying mental impairments established by objective and clinical findings" and her "[i]nability to concentrate, pay attention, and/or focus on a sustained basis." Tr. 24 (citing

Tr. 1482). Each of the reasons, which the form provided, was followed by a semi-colon and a line on which the practitioner completing the form could provide an explanation for his or her reasoning. Tr. 1482. But Colucci included no explanation. *Id*.

In assessing Colucci's opinions, the ALJ specifically addressed the factors of supportability and consistency. Tr. 24. He found that Colucci's opined limitations were not supported by the record, lacked consistency with the rest of the record, and needed more explanation because they were relayed through a check-box form. *Id*. Rutland fails to demonstrate that the ALJ's finding was unsupported by substantial evidence. In her brief, after reciting what she claims are the applicable standards, Rutland delivers excerpts of Colucci's opinions from the *Off-Task/Absenteeism Questionnaire* form. Doc. 7, at 5–7. She recites the ALJ's discussion of Colucci's opinion from the decision. Doc. 7, at 7. Rutland essentially claims that since she believes substantial evidence exists in the record to support Colucci's findings, the ALJ's determination that those findings are unpersuasive cannot also be supported by substantial evidence.  Doc. 7, at 10; *see* Tr. 1482–84. Rutland's argument fails for a few reasons.

Primarily, as the ALJ pointed out, Colucci didn't provide sufficient explanations for her opinions, which were submitted via check-box form. Tr. 24. Rutland asserts that since July 2019, Colucci's treatment notes have consistently contained findings that Rutland's thought process, attention, and

concentration were deficient. Doc. 7, at 8. Rutland argues that this represents "objective evidence" in support of Colucci's "opinion that Rutland would be off-task and absent from the workplace due to an inability to concentrate, pay attention, and/or focus on a sustained basis." Doc. 7, at 8. Rutland, however, discusses evidence that Colucci *could have* pointed to and that might support Colucci's opinions. *Id*. In this argument Rutland is asking this Court to reweigh the evidence, which it cannot do. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020). *See* Doc. 7, at 8–10. Whether substantial evidence might be found to support Colucci's opinions is irrelevant because Rutland fails to show that the ALJ's finding—that Colucci's opinions were not persuasive—was *not* supported by substantial evidence.

In contrast, the ALJ cited sufficient support in the record for his determination as to the unpersuasive nature of Colucci's opinions, paying specific attention to the factors of supportability and consistency. *See* Tr. 24. In finding that Colucci's opined limitations lacked supportability, the ALJ considered that Colucci had expressed them through a check-box form. Tr. 24. In this regard, the Sixth Circuit in *Kepke v. Commissioner of Social Security* explained that although "checklist opinions are not *per se* unreliable" in social security cases, an ALJ can consider an opinion's checklist "format" and whether the opinion "'fail[s] to provide any explanation for [the doctor's] responses.'" 636 F. App'x 625, 630 (6th Cir. 2016) (quoting *Price v. Comm'r of Soc. Sec.*, 342 F. App'x. 172, 176 (6th Cir. 2009)). Given the checkbox nature of

Colucci's opinions, and the lack of any adequate explanation, the ALJ was on a sure footing in discounting the opinions. *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."). The fact that the rationale Colucci provided, to the extent that it was an explanation, was vague and nonspecific further diminished the probative weight of Colucci's opinions. Tr. 24; *see also* Tr. 1482–84.

The ALJ then considered the consistency factor. He examined Colucci's opined limitations as compared to the objective medical evidence and found Colucci's restrictions inconsistent by comparison. Tr. 24; *see also* 20 C.F.R. § 416.920c(b)(2) ("The more consistent a medical opinion … is with the evidence from other medical sources the more persuasive the medical opinion … will be."). The ALJ, in his discussion of the medical opinion evidence and earlier in his decision as a whole, cited various findings—including some from Colucci's own treatment notes—that were inconsistent with Colucci's findings. Tr. 24. The ALJ found that Colucci's off-task and absenteeism opined limitations were inconsistent with other evidence in the record, noting encounters during which Rutland's medical providers—including Colucci—found her attentive, engaged, and able to attend to tasks. *See* Tr. 24, 1482.

For example, the ALJ considered the finding of consultative psychologist Dr. Konieczny that Rutland was "pleasant and cooperative" and readily

responded to all questions and tasks that he posed. *See* Tr. 23 (citing Tr. 1214). The ALJ highlighted the findings of Dr. Konieczny, who determined that Rutland did not have any limitations in attention, concentration, and persistence in the ability to complete single and multi-step tasks. Tr. 24 (citing Tr. 1216). Colucci had previously described Rutland's attention as "alert." Tr. 23 (citing Tr. 1491). The ALJ also noted that in February 2021, Colucci indicated that Rutland's attention and concentration were decreased "at times." Tr. 23 (citing Tr. 1382). The ALJ considered the observations of licensed clinical counselor Telisa Cross from August 2021, just weeks before the hearing. Tr. 23 (citing Tr. 1494). Cross found Rutland "happy" and "positive" and discussed Rutland's active engagement throughout the counseling session. *Id*. Cross, notably, made no mention of Rutland having problems with distractibility, concentration, or attention. Tr. 23.

The ALJ also considered Colucci's opined limitations as compared to the administrative findings of the state agency psychologists, which the ALJ found persuasive, and determined that Colucci's opinions were inconsistent by comparison. Tr. 24 (citing Tr. 85–90, 96–100). Dr. Johnston and Dr. Delcour found that Rutland was no more than moderately limited in her ability to pay attention, concentrate, and maintain pace. Tr. 85, 96. The agency doctors accounted for this limitation in their opinions, which restricted Rutland to simple tasks. Tr. 89, 99. The ALJ pointed out that neither of the state agency

psychologists agreed with Colucci's opinions on Rutland's level of off-task behavior or absenteeism. Tr. 24 (citing Tr. 85-90, 96-100).

The ALJ considered Rutland's abilities with respect to her own activities of daily living in finding that Colucci's limitations were inconsistent by comparison. Tr. 23 (citing 1213–15). Here, as with the other inconsistences, the record supports the ALJ's finding. Dr. Konieczny concluded that Rutland's grooming and hygiene were adequate and noted that she arrived wearing clean leggings, a top, and a vest. Tr. 1213. Her medium-to-long hair was tied back. *Id*. She had on light jewelry and make-up that had been applied appropriately. *Id*. Dr. Konieczny noted that Rutland was able to handle her own morning hygiene, get dressed, watch television, "engage in errands," attend doctor's appointments, visit her mother, spend time online, eat breakfast and dinner regularly and lunch occasionally, interact with her fiancé, read, attend church, and participate in occasional social activities with friends. Tr. 1214. Rutland reported that she handled the cooking, cleaning, laundry, and household tasks in her home, as well as her own shopping and the management of her own finances. *Id*. The ALJ considered Rutland's abilities in performing her daily activities of life and the objective medical record evidence when explaining his basis for finding Colucci's opinions inconsistent. *See* Tr. 23, 24.

So the ALJ assessed the supportability and consistency of Colucci's opinions, explaining as he did the rationale for finding them not persuasive. Tr. 23–24. Supportability and consistency are the only two factors the ALJ was

required to articulate, and he did so with citations to substantial evidence in the record. His decision to find Colucci's opinions unpersuasive was, thus, supported by substantial evidence. *See Biestek*, 139 S.Ct. at 1154. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

It was thus reasonable for the ALJ to determine that while Rutland had impairments, the record did not support Colucci's opinion about Rutland's limitations. Tr. 24; *see* Tr. 1482. The ALJ cited sufficient evidence in the record in support of his finding that Colucci's opinion was unpersuasive. Tr. 24. And so long as an ALJ explains his decision adequately, he is not obligated to fully adopt the opinion of a medical source. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *Davis-Lilly v. Comm'r of Soc. Sec.*, No. 1:20-cv-1261, 2022 WL 71575, at *3 (N.D. Ohio Jan. 7, 2022). Rutland fails to demonstrate any specific flaw in the ALJ's logic or otherwise show that the ALJ's conclusions were based on less than substantial evidence. Rutland may not agree with the ALJ, but disagreement "does not provide a basis for remand." *Steed v. Colvin*, No. 4:15-cv-1269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016). The Commissioner's decision should be upheld.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: September 27, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)